Freddie ANDERSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 67846.

Court of Criminal Appeals of Texas, Panel No. 1.

Sept. 30, 1981.

Mark Griffin, court appointed, Lubbock, for appellant.

John T. Montford, Dist. Atty., and Travis S. Ware, Asst. Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, DALLY and TEAGUE, JJ.

## OPINION

TEAGUE, Judge.

This is an appeal from an order of revocation of probation, after which appellant was sentenced to five years' confinement in the penitentiary. Appellant had originally entered a plea of guilty on September 6, 1978, to committing the offense of robbery, and had been placed on probation for a period of five years.

In his second contention appellant contends the evidence is insufficient to show that on April 30, 1980, he had violated a condition of his probation, as alleged in the State's motion to revoke, that he committed an offense against the laws of this State, to-wit, that he passed a forged traveler's check.

A summary of the evidence follows:

On April 30, 1980, appellant, accompanied by two female passengers, his cousin, Lovie Lou Sanders, and a person whom he had just met that day, Jackie Smith or Eneh, drove a 1972 Buick automobile, which was shown to be registered to Annie Tillman, appellant's girlfriend, into The First National Bank of Lubbock's drive-in banking facility. Appellant stopped at the bank's audio-visual pneumatic depository and placed therein 10 American Express traveler's checks and an identification card which depicted a photograph of Jackie but the name thereon was that of Lena Borquez. The signature name on the checks was Lena Borquez. Upon receiving the checks, Jacquelyn Douglas, a teller at the bank, due to the number of checks and the amount in-

volved, took them to her supervisor, Terry Taylor, for approval to cash the checks. Taylor became suspicious that the checks might be stolen and instructed Douglas to stall the driver of the car until the police could be summoned.[1] When Douglas returned to her teller's booth, the car, with its occupants, was gone. Shortly afterwards, Jackie returned on foot to the teller's station door and requested the return of the checks, saying she no longer wanted to cash them.[2]

Maeker, another supervisor, testified that he later saw a person, whom he "believed" to be appellant, standing across the street from the drive-in tellers' station. Another supervisor, Hermann, positively identified appellant as a person she saw standing in front of the bank building on Main Street about an hour later.

Lubbock police officer Earl Rankin testified that he arrested Lovie Lou and Jackie in appellant's automobile, which was then parked in a parking lot across the street from the drive-in banking facility. At the time of arrest, Jackie was in the process of tearing up a receipt for an identification photograph from a nearby photography shop. Rankin never saw appellant near the automobile. Several other American Express traveler's checks, with the name Lena Borquez on them, were recovered from the back floorboard of the car.

Lena Borquez testified that she had lost or had stolen from her some two years before in Amarillo the traveler's checks recovered by the Lubbock bank. She did not give appellant or anyone else permission to sign her name or cash the checks. When she last saw the checks, they were not counter-signed by her.

Louise Bishop, proprietor of Bishop's Campus Photography Store testified that two females and a male came to her store on the day in question to purchase a photo identification card for a female. She identified the card kept by the bank, with Jackie's photo and Borquez' name thereon, as the one her store had sold. She testified that appellant "looked like" the person who helped pay for the card. Appellant admitted when he testified that he helped pay for the identification card.

Appellant testified that he was just giving Lovie Lou and Jackie a ride to the bank when they asked him to first take them to a photography studio to purchase a photo identification card for Jackie. Appellant admitted that at the bank Jackie handed him the forged checks and he put them in the bank's receptacle-container at the drive-in bank facility of the bank. Jackie had told him that her mother had sent her the checks so that she could return to her mother's home in California to get her children.[3] Appellant testified he had no idea the checks did not legally belong to Jackie until Jackie said, while waiting for the teller to get authorization to cash the checks: "It's taking too long, something's wrong." After failing to get an explanation for this statement, and with Jackie saying: "F___ that, let's go," appellant drove off because, as he tells us: "I just got out of jail, I can't stand no-no case." After they drove to the street, Jackie asked appellant to let her out of the car so she could go back to the bank and "get (her) money." After letting both Lovie Lou and Jackie out of the car, appellant parked his car in a parking lot located down the street, took the car keys, and left on foot, not stopping until he met his sister, Joan Sanders, who was standing at a bus

1. What may have aroused Taylor's suspicion was the fact that printed on the card is the following statement: "Information on this card furnished by applicant NOT VERIFIED." What may have also aggravated her suspicion was the fact that to the naked eye, she was confronted with three different signatures—the original signature on the check, the endorser's signature and the signature on the photo identification card—all of which do not appear to have been made by the same person. The State presented no expert handwriting testimony at the hearing however.

2. Taylor and Dennis Maeker, see *infra*, testified that two females, not one, came to the door requesting the return of the checks.

3. Appellant's sister testified simply that "Lovie said that Jackie's mother had sent them to her."

stop several blocks away. He testified he and Joan caught a bus and he went home. He left the car because: "I knew something was wrong, I knew the police was looking for the car, I felt like that."

Appellant's testimony was slightly contradictory to that given by his sister Joan "Peaches" Sanders, as she testified that she asked appellant to take her to her bank, The First National Bank, which is apparently the same bank as above, and enroute they stopped and picked up Lovie Lou and Jackie. After seeing "a whole bunch" of traveler's checks in Lovie's hand, and after Lovie introduced appellant to Eneh as "Linda or something," when Joan knew her name was Jackie, appellant's sister then told appellant: "Well, you all take me over to that booth and put me out, 'so they took me over and put me out'." Later, they returned and Lovie Lou borrowed $5.00 from appellant's sister. Appellant's sister continued onto the bank on foot but after she saw "two females" near the bank, this caused her to go and catch a bus and return home. On cross-examination, appellant's sister also contradicted herself slightly by testifying she was successful in getting to the bank and, as she put it, "yeah, I got mine, yeah." She testified she was later taken to Lovie Lou's home, where she was let out. She testified that she did not see appellant "for like a week," after the day in question.

■ In a probation revocation hearing, the measure of the sufficiency of the evidence is by a preponderance of the evidence. *Solis v. State*, 611 S.W.2d 433 (Tex. Cr.App.1981); *Scamardo v. State*, 517 S.W.2d 293 (Tex.Cr.App.1974).

■ To prove the offense of passing a forged instrument, as alleged here, it is necessary to prove the defendant had the intent to defraud or harm another, *Solis v. State*, supra, *Pfleging v. State*, 572 S.W.2d 517 (Tex.Cr.App.1978), which necessarily includes proof of knowledge that the instrument be passed is forged, *Stuebgen v. State*, 547 S.W.2d 29 (Tex.Cr.App.1977). Appellant contends that no evidence of such wrongful knowledge was shown here. See *Solis v. State*, supra.

The evidence, however, does show that the purported purchaser of the checks, Lena Borquez, did not authorize anyone to sign her name to the checks or to cash them, and the checks were shown to be signed with her name without her authority, thereby showing the checks were forged. Cf. *Payne v. State*, 567 S.W.2d 4 (Tex.Cr.App.1978). Appellant was shown to have assisted Jackie in obtaining a false photo identification card immediately before going to the bank. He was also shown to have fled from the scene where the forged checks were attempted to be passed and cashed.

"While the act of running from the scene of the [offense] is of itself not proof of guilt, it is a circumstance which may properly be considered in connection with all the other evidence." *Baker v. State*, 504 S.W.2d 872 (Tex.Cr.App.1974). See also *Cawley v. State*, 166 Tex.Cr.App. 37, 310 S.W.2d 340 (1957). "Escape and flight being evidence of a circumstantial nature, its admissibility is not conditioned on a showing that guilt is the only reasonable conclusion. If the defendant offers evidence that the escape and flight may have sprung from some other cause, but its connection to the offense on trial remains a logical one the evidence would still be admissible, the defensive evidence going only to the weight of evidence." (Citations omitted) *Hodge v. State*, 506 S.W.2d 870 (Tex.Cr.App.1974).

■ Appellant offered to the trial court an explanation as to why he fled the bank scene. However, the trial court, as the finder of fact, did not have to believe appellant's asserted reasons for fleeing the bank's premises and later abandoning his automobile in a nearby parking lot. The fact of the flight, together with appellant's assistance in obtaining a new identification photo card immediately before the forged checks were presented to the teller, via the teller machine, are circumstances from which the trial court could find, at least by a preponderance of the evidence, that appellant did have knowledge that the checks were forged, and therefore had an intent to

harm and defraud another when they were passed to the teller via the machine. The evidence is therefore sufficient to show appellant violated his probation by passing a forged writing. His ground of error number two is overruled.

Appellant, in his first ground of error, contends that the admission in evidence of a photostatic copy of one of the traveler's checks that was transmitted to the teller via the teller machine violated the Best Evidence Rule. See Ray, *Texas Practice, Law of Evidence*, Chapter 32 (3rd Ed. 1980).

Lubbock Police Officer Earl Rankin, who received the originals of the traveler's checks from bank personnel, testified that he had searched for the originals before coming to trial, but was unable to locate them or determine what happened to them. He stated that he had turned them in to someone at the police property room, but that an Officer Tommy Wilbanks, who did not testify, had checked them out of the property room to take them to the district attorney's office, and that a search of all of the district attorney's files and of the police property room failed to locate them. Appellant contends that the failure of the State to account for Officer Wilbanks' activities in reference to the missing originals precluded a determination that the checks were lost so as to allow the admission of secondary-copy evidence. See *Ray*, supra, Secs. 1571–3.

Without deciding whether admission of the copy falls within the ambit of the Best Evidence Rule, see Id. at Sec. 1566, we find that admission of the copy of the check in evidence was not error for the following reasons:

Where loss or destruction is sought to be shown circumstantially by proof of an unsuccessful search, it is obvious that upon the thoroughness and appropriateness of the search will depend the convincing character of the proof. . . . The decision of the question as to whether it is feasible to produce the original document is wholly reposed both as it involves law and fact, in the first instance in the trial judge as a preliminary question.

Furthermore, the character of search required to show probability of loss or destruction will, as a practical matter, depend upon the circumstances of each case. The apparent importance or triviality of the document, and the lapse of time since it was last seen, for example, bear upon the extent of search required before loss or destruction may be inferred. The only requirement should be that all reasonable avenues of search should be explored to the extent that reasonable diligence under the circumstances would dictate.

To fetter the trial judge's judgment on that problem by rigid rules as to what is a proper search, or to review his decision thereon in the particular case except for apparent abuse, would seem to be an unwise practice for appellate courts. Id., Sec. 1573.

    *     *     *     *     *     *

We therefore hold:

What is sufficient proof of the loss of an original document or the inability of a party to produce the same is largely a matter in the discretion of the trial court. Wigmore on Ev. Vol. 2, p. 1407. If a reasonable effort has been made to obtain the original and there is no suspicion that the copy might differ from the original, the copy should be admitted. The tendency of modern decisions is to somewhat relax the rules of evidence and to turn on the light. *Spencer v. Levy*, 173 S.W. 550 (Tex.Civ.App.—Austin, 1915).

The record here reflects that the trial judge himself questioned Officer Rankin concerning his search for the original checks before ruling on the objection. Rankin testified that a copy of one of the checks was identical to one of the original checks the police had received from bank personnel. He compared the serial number on the copy with a number he recorded in his notes, when the originals were first brought to the police department, to verify this. There is no evidence, nor does appellant claim, that the copy in fact differed from the original.

We are further in agreement with the statement found in *Pacific Mid-Continent Corp. v. Tunstill*, 159 S.W.2d 908 (Tex.Civ. App.—Ft. Worth, 1942), that "the question of the sufficiency of the predicate laid for the admission of the secondary evidence being one addressed largely to the discretion of the trial court, we are not inclined to hold that there is a showing of such abuse of that discretion as would warrant a holding that reversible error has been committed." We find no abuse of discretion under these facts. Appellant's ground of error number one is overruled.

The order revoking appellant's probation is affirmed.